Good morning, Your Honor. I'd like to reserve seven minutes of my time, if I could. You'll have to watch the clock, because nobody waves flags. If it pleases the Court, my name is Mark Pettinari. I represent M2 SOFTWARE, Inc. I think a rational jury could find that Viacom, in this case, acted as a brazen infringer when it adopted M2 as a trademark for a new network. Yet after eight years of litigation, ten years of use of that mark, no jury has ever been given the opportunity to make that determination. Indeed, after this Court remanded the case for trial in 2002 on the issue of likelihood of confusion, we're here again in response to the lower court's granting of summary judgments in favor of Viacom, depriving M2 SOFTWARE from presenting its case for damages and infringement to a jury. I'd like to focus on just a few issues. There's a lot in this case. I think you are well aware of the briefing. And start with the willfulness issue. There's no prerequisite to a monetary recovery that you find willfulness. Section 1117A does not require it. The 1999 amendments to the Act make that clear. The Lanham Act was amended. What about 9th Circuit precedent? We don't have 9th Circuit precedent on that issue right now. But the statute makes it clear that there is no willfulness requirement. In 1999, when Congress amended the Lanham Act and Section 1117A, they added a willfulness requirement for Section 43C, dilution, but they did not add that willfulness requirement for Section 32 or Section 43A. Banjo Buddies in the 3rd Circuit has dealt with the issue and said that it's not a prerequisite to monetary recovery. But even if there is an issue of willfulness, there's a plethora of evidence in the record from which a trier of fact could have found willfulness or bad faith intent on the part of Viacom that would have led to a finding of attorney's fees. Actions before the PTO where the Viacom sought to register M in design, not disclosing the use of the letter 2, the number 2 in the word mark, whereas they had filed registrations for M3 through M10 seeking to disclose the actual use of the number. There was an omission of the interactive portion of the use, even though in the United Kingdom the registration did disclose the interactive portion of the use of the mark. There was license of M3, but no attempt whatsoever to contact or even seek a license of the M2 registration, which was prior and on the technology edge of the music industry. There was misrepresentation by Viacom's counsel in response to the first cease and desist letter, indicating that they weren't using this interactively, despite the fact that it was. It was all set up as a technology edge interface to the music industry where Intercast teamed up with Intel and was one of the first networks in which, in fact I believe it was the first network, in which people could interact with the program. If we draw a comparison to the totality of circumstances, factors that are required in the patent arena, we'll find that there was evidence in the record of every single factor. If we look to whether the defendant deliberately copied the mark, Viacom knew of us. Viacom knew of M2 software in 1992. Despite the fact that they claim they don't remember, they knew about it. There was never an investigation of the scope and good faith belief that the mark didn't infringe. The defendant's size and financial condition should be taken a look at. Viacom is huge compared to M2 software. When they splashed this mark, they splashed it nationwide, all over the place. When they say the mark wasn't that successful, yet 11 million people subscribed to the station, to the network. 11 million people is a lot of people in my life. Absolutely. BMG cut back its contracts dramatically as a result of this lawsuit, as a result of the coming out of the M2 mark by Viacom. We lost all of the international work that was being done for BMG records, and our national work got cut in half. We were required to issue a warranty of non-infringement, because BMG... What's the nexus that you have in the record, other than that that happened? The fact that Viacom launched the M2 mark. Okay, that happened, and then, so did that business ever specifically say that, why they were not dealing with it? Absolutely. They thought that M2 software was infringing on a Viacom mark. Where is that in the record? It's in the actual briefing. I would have to look for it. If you want, I can look for it during the break. Do you have a cite from the brief? Yes. The testimony is Ken, for BMG. In addition to that, the size and condition of the defendant, we look to the behavior and litigation. This was a strategy of over-aggressive attrition. There were 30 depositions taken within a seven-month period of time before a summary judgment motion was filed. This case has been to the Ninth Circuit twice. It's been in litigation actively for eight years, and we still have not had a trial. Yes, it's time for this case to end. It's time for this case to end by a trier of fact, a legitimate trier of fact, hearing the evidence of record and making a determination. We have never been given that opportunity. The closeness of the case is another issue that's a factual question, whether it was close or whether it was not. Was the choice to use M2 the way that Viacom did, as both a wordmark and a logo, the large M and 2, was that close to the M2 registration for a wordmark in the technology edge of the music industry? It's up for the jury to determine that. The duration of the defendant's conduct, it's now been going on for 10 years. We are in the decade of conduct. I have a question about whether you've waived on the 1125 claim. I don't believe we have, Your Honor. There's nothing even in the clarification order from the panel that decided the 2002 order to indicate what trademark. You have to raise it in your brief. Did you do it in the footnote? Which brief? At the court below in the 2002? Here. In this case, it's addressed. The waiver issue is addressed at both the reply brief as well as the opening brief. I'd have to look for it directly. But are you are you saying it is addressed in a footnote in the reply brief? I believe early on in the actual reply. I can pull that up during the opposition. We also look to the defendant's motivation. Our expert has come up with an analysis that determines that there was a billion dollars attributed to the MTV network from the M2 network that was adopted. That's a that's a heck of a motivation. A billion dollars over a nine year period of time. A remedial action that was taken by the defendant. There was no remedial action taken by the defendant. And you look to whether the defendant attempted to to conceal the misconduct. And then we go back to to the testimony of Silverman for Viacom, where he said that there was no there was no interactive component to use of the mark. That was deliberate concealment. We look back to the PTO and we see that during the application of these marks, there was an attempt to conceal the two. In fact, as your honor knows from the record, the PTO rejected the mark after it changed. And in design, it struck it and said, no, this is a mark for M2. And then it rejected it on another. These are factors. The record was was was full of evidence like this that was discounted deliberately by the judge below or ignored. And more important, if the judge did do away, he's not entitled to weigh the evidence that's presented by Viacom against the evidence presented by M2 software and make the decision. This was not a bench trial. This was a summary judgment motion. We have not had a trial. That's the most important thing. We cannot be in a situation where the judge resolves genuine issues of material fact at the trial court level and says there's no there's no reason to go any further. It has to be clear and it isn't clear in this case. We turn to the damages aspect of the case. And I want to point out the actual damage is kind of a red herring here. There's a lot of things in the briefs that don't really look like they belong. What's most important is that the district court below relied on the evident relied on cases from a false advertising law. I mean, that's forty three one A B. I mean, one B. Forty three A one B false advertising, which requires actual confusion to identify which competitors actually harmed. Look at the reply. We have the page 17 and no 21. We've addressed that issue specifically again. The issue in the in the in the appellee's brief where they talk about the record on the actual damages that goes to the weight of the evidence presented on actual damage. The judge doesn't get to resolve this at the trial court level on summary judgment. There has to be a trial to determine whether that way how to weigh that evidence, whether there's enough for actual damages, whether there isn't. We know that there was there were actual damages suffered by M2 software. That's no there's no question about the evidence is clear on that. The question is how much the judge said none. He rejected all of that evidence. No, he just did not believe it. And rejected it on the grounds that he felt that the record of evidence presented by him to software for its damages wasn't enough. What you believe that, you know, that there is in the evidence before us that we could use to reasonably calculate loss to show that there were lost. But tell me what that evidence is in your from your perspective. It's the evidence that BMG refused to extend the international contract to us, that it cut half of its national work. It cut its national work in half, that there was a damage to the reputation and goodwill of M2 software throughout the industry because of the fact that this litigation existed. And there was a belief that M2 software had adopted inappropriately adopted a Viacom trademark. That is throughout the evidence. The record is as the briefs refer to the various places in the record where this evidence is there, Your Honor. And you're and that's where you want to use your reverse royalty. Imputed royalty. No, that is not, Your Honor. And that leads me to the next point. It will damage his issue. But the question was, how do we calculate the lost profits? The last problem in the actual damages. You cited the fact that BMG cut back. Okay, I can understand that you would be able to do a before or after analysis on that. Loss of reputation and goodwill. How did you propose to measure that? From the quantification of the lack of business that resulted as a result of this lawsuit and the adoption of M2 software's mark. And was that proffered in your assembly judgment papers? I believe so. Now, the second element of damages under the Lanham Act is defendant's profits. And defendant's profits are not just, there are three ways in which you can show defendant's profits. The first is to show defendant's profits being disgorged as a measure of the plaintiff's damage. When you don't have actual, the typical place that would happen is in a counterfeiting case. Where a product is being sold with a registered trademark that's not the client's product, not the plaintiff's product. Every product results in the plaintiff's actual damage. So, you disgorge the defendant's profits and you've equaled the plaintiff's damage. You have a choice, I can get my loss profits or I can get their profits. But you can't get both because they equal both in that situation. The second is by showing the defendant's profits, defendant's profits that are disgorged as a result of the unjust enrichment that's resulted to the defendant from the use of the mark. And the third is when the defendant's profits are disgorged for deterrence purposes. What has been argued in this case are the latter two. The defendant's profits should be disgorged for unjust enrichment created by or given to Viacom as a result of its inappropriate use of the M2 mark. And to avoid, to create a deterrent situation from its pattern of behavior. And we go back to the TV land situation and the Lee cases where Viacom adopted marks that had great brand position. Regardless of the fact that they may have been registered marks in the hope that they could just overwhelm the defendant. I mean the plaintiff. You may want to save some of your time. You're down to below six minutes. Okay. I'd like, thank you, Your Honor. I'd like to point out a couple of other points. One in particular is that the improper narrowing of the injunction. In this case, the judge below should have applied the safe distance rule. There was a finding by this court that no, that a reasonable jury would have found that there's a likelihood of confusion with the M2 mark as used by Viacom. Not only in the word context, M2 written in text, but also the initial logo. Actually the initial logo and what we call the nickname logos one and two. Those were all before the Ninth Circuit in 2002. Down below, the court said, would you stipulate to an injunction Viacom? And Viacom said, sure. And they came up with an injunction that only prohibited them from using the word contextualization of the mark. None of the logos. And we said, no, we're not going to do that. The overall commercial impression of the M2 marks is that of M2. And if you look at them throughout the record, you can see that they are commercialized that way. That creates the impression of the M2. Put them together in a page here, I can give the court later on, in which they're all conveying the M2. And we haven't used them in any context. It's not in the briefs. They're just on one page here. So the injunction below allowed Viacom to use the original logo and logos one and two. What we call nicknames logos one and two that were before the court and subject to 2002 reversal. There's never been a summary judgment ruling or a trial on the original logo. There was a ruling on the logos one and two. What happened if there wasn't a ruling? The ruling was the permanent injunction that was entered. Nothing on the merits was ever taken. Despite this court's instruction to the court below that there should be a remand for a determination of likelihood of confusion. Again, it didn't happen. I think brand positioning is the crux of this case. And Viacom has valuable assets in the way of trademarks. Its Viacom name and its MTV names are incredibly valuable in the marketplace. And it sought to find one that was brand positioned where it needed to be on the technology edge of the music industry. And it found it with MTV. Already in the interactive music environment. Already doing record label management systems on a computer arena that was far in excess of anything anybody else had been doing. And Viacom took it. Good morning. Good morning. It's actually probably getting to the afternoon. Almost. Almost. I can't see my clock. Time for lunch almost. Larry McFarland with Keith McFarland and Wilson on behalf of Eppley. I think it would be helpful. I do want to address a lot of the statements that I do believe are incorrect. But I think it would be helpful to quickly run through what we see are the outstanding issues regarding damages. Which to me is what we've focused on so far. The first is alleged lost profits. Can you address the willfulness point? Do you agree with the counsel that under 1117 willfulness is not required? Absolutely not. There are two cases. The Gracie and the Kasbaum case. Ninth Circuit 2000. After the amendment to the Lanham Act. Both of which repeat, as your Honor mentioned, the long-standing Ninth Circuit authority that willfulness is required in the Ninth Circuit to get an account. That has been the law in the Ninth Circuit for as long as I can remember. And it's still the law. And no less of an expert than Professor McCarthy says in Section 30-62. The 1999 amendment of the Lanham Act, Section 35A, was not intended to change the law by removing willfulness as a requirement for an award of profits in a classic infringement case. But rather was meant to correct a drafting error regarding remedies in dilution cases. So we think the law is absolutely clear. And it would be a reversal at this point of long-standing Ninth Circuit precedent to say that willfulness is not required. See, that's what I think is significant about whether there's an 1125 thing. Because I'm trying to agree with you that those Ninth Circuit cases would be precedent in the willfulness issue. But I don't think that 1125, that there's a requirement for willfulness. And let's talk about that, your Honor. One thing. I've handled this case since the beginning. It's been a long case. My sadness for both of you. Thank you. And let me just explain to the Court what happened. It's all on the record. But what happened is the earlier appeal to the Ninth Circuit. We go up to the Ninth Circuit. And the only claim specifically raised by Appellant M.T. Software was for federal trademark infringement. And we know that there was also an 1125 unfair comp claim and dilution claims and state law claims. We go up. The Ninth Circuit reverses. It comes back to Judge Matz. And he asks us to do a scheduling order or status order. Viacom sets forth its position that there only was one claim raised and, therefore, one claim remaining. And that was for federal trademark infringement under 1117. Not surprisingly, M.T. Software took a different position. M.T. Software said, everything's at issue. It's reversed. It's all at issue. And Judge Matz says it's all on the record. Judge Matz says, well, there's basically three choices here. Either only 1117 is left or all of the claims that turn a reverse confusion, which would pick up 1125 and the state law claims, are left. Or everything's left and that would pick up dilution. You've got three choices. And he lays this out in his order. We then go up to the Ninth Circuit and seek clarification. And it's crystal clear in the papers to the Ninth that our position is only one claim. One. And then the Ninth Circuit issues its order in which it says, we reverse the grant of summary judgment only on M.T. Software's federal trademark infringement claim. Period. Now, in their brief, they say the Ninth Circuit somehow doesn't understand the difference between the word claim and claims. Plural. I think the Ninth Circuit does understand the difference between the singular and the plural. And secondly, it was at issue. It was not something that was skirted over. It was briefed thoroughly in the papers. So in my view, there's absolutely no question that the only thing left is federal trademark infringement under 1117. And that is a critical issue because of the willfulness issue. And it's also a critical issue because of the damaged reputation issue. There's both the Dacosta case and the Peaceable Planet case that say that if someone falsely thinks that you're a pirate, that may be some kind of other damage. But that is not a compensable injury under the Lanham Act for federal trademark infringement. In both those cases, they are absolutely on point as to the fact that damaged reputation is not recoverable under 1117A. Whether or not it be recoverable under 1125 or disparagement law, other things, but not under 1117A. So that's a very, very critical point. As to lost profits, if you'll notice in their opening brief, they don't raise lost profits. So as an initial matter, that's been waived. The only thing they talk about in their opening brief is corrective advertising. They talk about corrective advertising and damaged reputation. Those are the two things they talk about in their opening brief. They do not talk about lost profits. And it's not surprising. If you go back and look at lost profits and you look at Mr. Ross, their expert, and I take Mr. Ross's deposition, he did what he called a financial projection analysis. He didn't do a buildup analysis. Your Honor was asking the question, where's the meat? Where's the contract that you lost and how much did you lose? How much were you damaged? Mr. Ross, I asked him the question. I said, was there not enough evidence to do a buildup analysis, a contract-by-contract analysis for lost profits? And he corrected me. He said, I wouldn't say there wasn't enough evidence. I'd say there wasn't any evidence, not any evidence to do a buildup analysis. Why? Because BMG entered into the biggest contract in the history of M2 Software. That's what happened. And when you look at Dave Escamilla's testimony, if you could bear with me for just one moment, we ask him, no one at BMG International ever told you that they were not going to enter into a license agreement with M2 Software because of any actions on the part of the defendants, did they? That's the impression that I received. I'm not asking your impression. I'm asking, did anyone at BMG ever tell you they were not going to enter into a license agreement with M2 Software because of any actions of the defendants? In terms of specific conversations, I don't recall. I don't have a recollection. Where do you find that in the record? SCR 218. So, also, there's a reference. I think it would be helpful if I just kind of quickly go through some kind of way I see the case, and I can pick up, with my time left, some of the misstatements. So, going back, again, to actual damages. Lost profits, it's waived. Ross, though, an expert, said there's no evidence. There's no causal link at all between any actions of Viacom and any actions on behalf of BMG. There's no actionable confusion as to the source of products. Again, 1117 is all about confusion as to the source of the products, not defamation. There was some confusion in the testimony that did come in through the deposition. What? Who was the owner of M2, and it's sort of arguably a fine line between that's a confusion as to who owns it, in a sense, of proprietary right, or who is controlling, you know, who's the source of origin of these two products. Which do you think it is? I think what it is is there was some confusion, like falsely being thought a pirate, which is the DaCosta and the Peaceables case. And that is not actionable under the Lanham Act 1117. Here's the testimony. Kim, what did Mr. Eskami say in response to your statement? He said he owned the trademark M2. Question. Other than that, were there any discussions regarding your questioning the credibility of M2 Software after he replied that he owned the trademark? No. Did you know that M2 Music Television was not related to Mr. Eskami at the time? Were you questioning the credibility of M2 Software? At the time I made this statement, I probably thought they were two separate companies. Again, the touchstone here is confusion as to source. And again, there's no evidence in this case of confusion as to source. But I don't want to lose the other point. And that is the only relevance that this testimony has would be to alleged lost profits. It's not relevant to corrective advertising. Or it could be relevant if you think there's a damaged reputation recovery under 1117. We'll get to the other ones in a minute. It doesn't come into play in discouragement or lost royalties or anything else. That's the only one. And again, lost profits is abandoned. And there was a motion in limine pending with respect to Ross's opinions on the subject that there was no admissible evidence that they didn't meet the Daubert standard to go forward. Well, I'm not sure where you're going with that. My impression is that what they're trying to argue is that M2 was an established brand that got hijacked by Viacom. And that if the public or the industry somehow thought that Viacom was in fact the source of M2 generally, Viacom got a leg up right from the get-go because it piggybacked off an already established and respected brand. So I'm not sure. When you say that testimony doesn't go to anything other than lost profits, it's not clear to me that that's true. That also would support unjust enrichment. With respect, Your Honor, this is a reverse confusion case. I know it's a reverse confusion case. I've tried it. I'm just saying. So the issue is that the public thinks that their product emanates from us, and we're not hijacking. That's right. They think your product emanates from you, but the brand which is in their mind, which is already in their embedded in their consciousness, they think it's MTV's brand. And that's a brand that they've already, thanks to the efforts of M2, had some familiarity with. And they think, gee, that's terrific. I didn't know it was Viacom that was in it. No wonder they're such a good product, because it's Viacom. So you've just gotten the benefit not having to create a brand, brand awareness and reputation. You piggybacked off of it. I don't think there's any evidence of piggybacking in this case. There may not be evidence. I'm supposed to say it's irrelevant. That's why I wasn't understanding why you limit the reverse confusion to lost profits. It's not just that you sucked up what they had. You could have gotten a benefit and enrichment from piggybacking off of their mark. I'm sorry, and I'll get to that, Your Honor. I meant to say under the prong of actual damages, talking about that for a second, there's three different conceivable types, lost profits, damaged reputation, corrective advertising. They don't allege lost profits. I think it's waived, and I've given my reasons. Damaged reputation, not recoverable under the relevant authority. Corrective advertising, they can't get it under the address case because they didn't value the mark. The address case, which follows the Zazu case, says you can't get a windfall if you haven't valued the mark, and Ross testified he hadn't valued the mark. They can't get it, so they don't get corrective advertising. Does some of these questions raised by Judge Fisher at least point to the possibility that there are some factual issues for determination? No. Why not? Well, let me get to that because if you're talking about the kind of evidence that's required to establish damages, I think it would be helpful if I could go through what's required since we've now gone through actual damages. Let me go through the evidence that's required and not required and what's in the record that shows that there's no other type of damage that the plaintiff can recover because the MTV2 issue we can talk about, they have an injunction against MTV2 and MTV Music Television, and as you know, the remedy of choice in a trademark action is an injunction. They have that. The issue now is, is there evidence in the record to establish that there's an entitlement or jury question with respect to damages? And as to Viacom's profits, the first problem they have is that the plaintiff must prove and establish the sales that arise from the defendant's use of the mark. Well, you've got a bundling issue here, and I've got a problem with putting the burden on the plaintiff. If you bundle your M2 with the rest of the package deal, why are they the ones who are supposed to segregate them? Well, Your Honor, the bundling is a bit of a red herring. It's offered for free. There is no revenue, incremental revenue. If you look at the testimony of Tom Freston, which they only gave a little part of the testimony of Tom Freston, the reason for it, we can go back to that. If I want to determine what impact the distribution of M2 had on the penetration of MTV or VH1, what do I need to look at? You wouldn't need to look at anything because it had no impact. That's your testimony, absolutely. There's not one cable operator who would have added MTV or VH1 because he got M2 first off. None of them have taken M2. Secondly, those channels have virtually complete distribution in the cable universe. No money, no increased penetration, no benefit. That's the undisputed evidence in the record. And the Lindy Penn case, I think, Your Honor, is quite important here because in Lindy Penn, the Ninth Circuit, the plaintiff there complained because in Lindy Penn, the issue was that the defendant, the only thing that there was liability for was the defendant's sale of the pens by phone, back in the days when people sold things by phone. And they rejected the plaintiff's claims that it could not segregate revenues from infringing uses since defendant never separated its products according to sub-markets. Instead, the court held the plaintiff had access through discovery to defendant's records from which a reasonable estimate could have been accomplished. The same thing is true in the Rolex decision, which is another Ninth Circuit case. The burden is on the plaintiff to establish the revenues derived from defendant's use of the mark. And they can't establish them. Why? Because there weren't any. There weren't any revenues. The undisputed evidence in the record shows we gave it away for free during this time. The undisputed evidence also shows that there was nothing unusual about that, nothing pernicious about it. There's a footnote in one of the memos that talks about during the time that people were trying to launch cable channels, some people were actually paying for carriage, as opposed to just giving it away. You're running down on your time. A question I'd like you to address, if you don't mind, is this issue of the injection system. As I understand it, counsel's argument in this case got remanded by us. It was for a determination on the use of the logo in connection with the CD-ROMs. I think it was actually for use of the mark. The logo, the mark, whatever. The scope of the injunction seems not to have addressed that issue. In other words, I have a little trouble understanding the way this injunction got done because it incorporates two exhibits. So can you explain and respond to counsel's argument as to why there isn't a problem on the scope of the injunction? Yes, sir. The MDV-2 issue, the first one, they call them the nickname logos. MDV-2, that logo was used beginning in March 1999. The plaintiff drops a footnote in one of the summary judgment briefs, their opposition, I believe, and says that that's a continuing infringement. When they go to the Ninth Circuit, they don't raise the MDV-2 issue. Therefore, it's waived. It's gone. So there's layers of arguments as to MDV-2, but that's the first one. You can't come back. You knew about something. You never amended your complaint. You never did anything about it, and you didn't raise it at the Ninth Circuit. You can't come back later and claim that there's somehow some problem. Then they go on and say there's this new MDV-2 logo. If you look at the record, what that means is it's the MDV logo with a line and a 2. Sometimes it's a line horizontal and then a 2, and sometimes it's a line that's vertical and then a 2. But it's the MDV logo, one of the most famous logos in the world, and a 2. Maybe I can make it more specific. I don't have the copies of these things. The objection says something to the effect that nothing in this judgment precludes defendants from using any and all other names, logos, including without limitation the various logos attached as exhibits to this judgment. Exhibit 2 is an image of the original M2 music television logo, and that's the one that got remanded to determine whether that created a likelihood of confusion between M2 software and the CD-ROM products. That was supposed to be resolved on issues of likelihood of confusion. Now, does the injunction allow you to continue to use that, Viacom to use that? The injunction would allow Viacom to use that logo, which was the flip side of the mirror image. It was the MDV logo. It was the reverse side. You could see music television on the bottom and seeing the B sit out. You're right. A technical reading of the injunction would allow us to use it. Now, the injunction also says that we cannot use M2 and we cannot use M2 music television. So if we were to use it and anyone were to determine that that was the functional equivalent of M2, then we would have a problem. So what happened on remand is that Judge Matz exercised his discretion to draw a line, because that logo, that original M2 music television logo, incorporates in its entirety our logo, our MTV logo, that predates plaintiff by a decade. And so it's a line-drawing issue of coming up with an injunction that both addresses our rights and protects the plaintiff's rights, number one. Number two, if you read the oral argument and the briefs in the original Ninth Circuit case, the focus was never on the logo. And, in fact, you can go back to the very beginning of this case, the focus has never been on the logo. The focus has always been on the word mark. If you go back to 1999 and look at the oral argument at the preliminary injunction, which was denied, it was all about the fact that we referred to M2 music television in shorthand as M2, the word mark. That has always been the focus of this case, is the word mark. Their logo is an M and a 2 and an ellipse. So, again, going back to the Madison decision, if we want to look at some of the other decisions out there, comparing their logo to our logo, there's no similarity whatsoever. Their word mark, M2, or now in our case, M2 music television, we are enjoined from using. So it's 39 seconds. The billion dollars of their alleged revenues, they say an expert came up with that. That's not true. All of the stuff about SEC and everything else was never produced in the case. It's in their brief, but it was never the subject of any expert opinion. They did waive their 1125 claim. One minute. I think we've got it. Sorry. Thank you. OK, Judge Callahan, I wanted to address you with the sites that you had requested in the opening. The waiver of the Section 43A claim that you had referred to. Where was it in the brief? It's dealt with at the opening brief at page four, note two. In the reply brief at page one, note two. And the language in the 2002 decision, M2 versus Viacom, which is also in the record, I don't have the site in front of me, refers to M2 having rights from the registration. That's the federal trademark registration claim under Section 1117. I mean, Section 1114, Section 32 of the Act. And then it refers, moreover, to M2 having senior use and being a senior user of the mark. And that language in that section of the opinion, that's where the 43A claim is dealt with. Now, it discusses non-registration rights in the context of the rights it obtains from the registration, and it discusses trade name usage under 43A when it starts off talking about senior versus junior use on senior rights. The damage to the credibility that I referred to earlier, that is from Ms. Kim, is found in the opening brief at page 14 and, again, at page 46. The damage to the reputation that's recoverable can be found and supported by the Beacon case, and it's referred to at page 17 of the reply brief. Actual damages have never been waived. It's dealt with extensively at the opening brief at page 14. The nature of those actual damages may not be a billion dollars in profits, but they were actual damages nonetheless. The mention of a waiver of the claims that Mr. McFarland just spoke about, where that gave rise to an injunction. I think Your Honor was asking counsel about the injunction and the scope of the injunction, where he indicated that there was a waiver of the logo, the challenges to the logo. There was never any such waiver, and I turn the court, refer the court first to the complaint, and it's cited at page 56 of the opening brief, and it's also the ER site is 1 through 17, and I would refer the court to the language of the actual complaint where it says, using in any manner the trademark M2 informatives thereof alone or in combination with any other word or words or design or designs which so resemble plaintiff's M2 trademark as to be likely to cause confusion. We couldn't amend the complaint. What would we have said? We had covered it all. I refer the court to the July status report, which is found in the actual docket. You'll see a reference to the July status report in a minute order where we disputed this issue, where the logos replaced the issue, and that's July 2002, and also in October 2002, the status report. These marks, these logos were in front of the Ninth Circuit on the first round. When I showed the court these marks, the first is a word mark. The second is the initial reverse image of the M2 mark that was used with the word mark. The third were the two marks adopted in 1999. They were all, all of these three lines, these three rows were in front of the Ninth Circuit when it rendered its decision before. This mark was adopted later on, and as you can see, it's not very far away from this. The overall commercial impression created by these marks with a large M and a large 2 is M2. Okay, and where exactly does that document come from? This document was compiled from the appellant's opening brief at page 53 through 59 and the appellant's reply brief at pages 23 and 24, and the ER record is 344.7 through 9, and I have copies of that I can pass to the court. In order to be a waiver, there has to be a clear, decisive and unequivocal statement of a purpose to waive legal rights that never existed in this case. In fact, the litany of references that were raised by Mr. McFarland in his statement were created by the court. This was not an issue raised by Viacom. Viacom never even alleged reliance that was suggested by the court. There must have been reliance. There was no reliance. There was never a waiver of any claim. The dispute over the stipulated injunction stems from the fact that M2 software refused to enter into an injunction that would have given away the rights that it had in those logos. Okay. I think we have the point. Okay. Thank you. Thank you. I appreciate the argument by counsel. And this is another interesting case for the day. It ends our calendar for the day. We stand in recess. I'll rise. This session stands adjourned.
judges: Gibson , Fisher, Callahan